The call for oral argument this morning is People v. Benjamin Scott. May I please report, counsel, I represent Ben Scott in this matter, and he has convictions for aggravated discharge of a firearm, unlawful restraint, unlawful use of a weapon, criminal damage to government-supported property, and he was found not guilty of attempted murder. The facts in this case are so peculiar that it's kind of like that old story about describing an elephant, like if you feel different parts of it and every witness gives you a description of what they saw, you'd have no idea you were talking about the same thing. No witness in this case has told a story that jives at all with any other witnesses. So it makes a very interesting case from the very beginning. I raised four issues, and I'd like to start with the third issue, which is reasonable doubt on the aggravated discharge of a firearm. To convince someone of that, you have to prove that he knowingly or intentionally discharged a firearm in the direction of a person. Whatever caused this to happen and whatever happened after it, I want to focus specifically on the part where the defendant supposedly fired a shot into the wall of this apartment. According to the complainant, Mr. Frost, the defendant held a gun to his head and then turned the gun to the wall and fired. According to the defendant, he fired at the wall in an effort to frighten Frost from whatever he was doing. According to Mary, who oddly is laying on the couch in her underwear when she receives company in the evening, she testified that when she was asked specifically the direct question whether the gun was pointed at Frost's head at the time, she gave a nonresponsive answer, something about, I thought he done shot him in the head, I thought he keeled over dead, which was not at all responsive to the question. We don't really understand the perspective of where she was sitting versus where the shooting, where Frost was standing and where the defendant was standing. The crime lab witness, Gambo, did not offer any information about trajectory, whether this story versus that story was more likely or whether this could be true or that could be true. We don't have any information about any of that at all. In fact, he couldn't even say that the gun that was supposedly linked to this offense could have fired the bullet that was found in the wall, so he really doesn't have much to offer to this at all. We have three witnesses, two of whom specifically say that the gun was not fired in the direction of the complainant, and one who won't answer a direct question about it. That leaves us with absolutely no evidence at all to support the aggravated portion of this offense. And I did ask in my, the remedy I asked for was to have the conviction vacated. I don't know why I said that. What I need is it to be reduced to remove the aggravated portion of it, but because there's absolutely no evidence to support the finding that the jury made that the weapon was fired in the direction of anyone, that's what we would ask you to do is reduce that conviction. I also want to talk about the second part of the first argument, which is the prosecutorial misconduct issue. The second part of that argument is where the prosecutor asked the defendant if the witnesses against him were lying. This was no slip of the tongue. The prosecutor asked the defendant if no less than five witnesses, which is essentially all of them, there may have been another officer or somebody else involved, but almost every witness, the defendant was asked if they were lying. First, he was asked if Frost was lying about something kind of inconsequential, whether or not the defendant, whether or not he actually recognized the defendant when he came to the door. He asked, he said to the defendant, so that's a lie. The three witnesses that saw, claimed that they saw things outside but know nothing about what happened inside, were asked four times. He was asked four times, you're saying they're lying and you say they're lying, that's bull, that didn't happen, they're lying. Four separate times, he was asked about three other witnesses lying. He was asked three times if Officer Martin was lying. And eventually, the prosecutor wrapped it all up with, so everyone but you is lying. This was no slip of the tongue. This is a prosecutor who doesn't understand you can't ask that question. There are two reasons why you can't ask that question. You certainly cannot ask it 14 times, which is, I think, what it came to in this case. It invades the province of the jury and it makes the defendant look like an idiot because he's, you know, ridiculed and demeaned in front of the jury. It was objected to finally on the last everybody but you is lying comment. And obviously, counsel should have objected the very first time and nipped this in the bud, but he didn't. So, the prosecutor was allowed to ask it 14 times. So, we would ask you to consider that as plain error or as ineffective assistance of counsel. It's clear it's an error. It's clear it would have been sustained the first time had he objected to it because ultimately it was. Meanwhile, the damage was done and the defendant was demeaned and ridiculed in front of the jury and the province of the jury was invaded by being forced to answer that question. The state suggested that because the defendant kind of held his own with the prosecutor, that he wasn't harmed by this. There's no case law out there that says that the defendant is going to stand up and argue back that he's not harmed. In this case, this all came down to credibility. This is the craziest case in the world. The defendant has one story. The complainant has another story. Old Marion or underwear has another story. These neighbors all have a different story, none of which matches each other or any other evidence in the case. We don't know what happened here. This is all about credibility. When you start asking a defendant to comment on the credibility of virtually every single witness against him, that's a serious error and that's enough to deprive a man of a fair trial. We'd ask that he would reverse all of his other convictions and remand for a new trial on this. If there aren't any questions about any of my other issues, I'm going to sign off. Thank you. Thank you. Counsel? May I please declare counsel? I guess I'll follow the same order as counsel, starting with the sufficiency of the evidence. I'm not quite sure where counsel said that the witnesses both said that it was never fired in the direction of bullying and fraud. That's not true. I don't know on the record it says that. He was at, he said, it was not fired at me. He said that the bullet went right in front of me and this is at the record of 353, 368. Counsel is grounding this claim on the fact that in the record you're not going to find some use of the language fired in your direction. No. It doesn't need to be. The jury heard about where the shell casing was found, where the hole in the wall was, where Frost was sitting relative to where the hole in the wall was. They heard about where the defendant was standing when he fired the bullet. From that, they could very well deduce that the gun was discharged in the direction of William Frost. Now, counsel talked about how the shot was fired at the wall. State does not disagree. It was fired at the wall. Fired at the wall is not mutually exclusive from being fired in Frost's direction. Frost was sitting on the ground back against the couch next to the wall. He testified that the bullet went in front of his face within a foot into the wall. Defendant was standing and shot in that direction. That's still in his direction. Yes, it went into the wall. No, he was not trying to kill Frost. He was trying to get Frost to stand up and follow him outside, which after he fired the warning shot, that's exactly what happened. He got up and followed him outside. So conceitedly, there's not going to be any testimony in the record where somebody said the bullet was fired in the direction of Frost. It doesn't need to be. There was plenty of evidence in there for the jury to deduce that. The law says, and this is People v. Owens, that whether a discharge is in the direction of somebody else is a question of fact for the jury. Moving to the veracity questions. Conceitedly, it was error. The questions were inappropriate. There's no way around that. But the question is, was it reversible error? Because this issue was weight. The vast, vast majority of cases, and they're stated at length in the People's Brief, pages 10 and 12, say, no, this is harmless error, for the reason being that when a defendant gives one version of events and the state's witnesses give another version of events that is completely opposite, as it was in this case, obviously someone is lying. The jury is going to have to deduce that on their own without the prosecutor bringing it up. In this case, the defendant is getting on the stand and saying, I never made Frost go outside. I never made him kneel. I never pointed the gun at the back of his head. Meanwhile, you've got three unbiased witnesses and the defendant and his girlfriend saying that's exactly what happened. Well, somebody is lying. The jury would have deduced that on their own. They did deduce it on their own. And in order for this to have constituted reversible error, the defendant had to have been ridiculed and embarrassed and made to look so stupid to such a degree that the jury's verdict was changed as a result of those questions. And that is why I had, in the people's brief, mentioned that he held his own. Because this isn't some technical analysis where, yes, there's an improper question, thus there's a reversible error. This is a subjective analysis. Did he seem belittled in front of the jury? Did he seem to have been made such an idiot that the jury would have changed their verdict based on it? No. I think once you read the record, your honors will see that there was a dialogue between the prosecutor and the defendant. He did not appear to be made to be such an idiot that the jury based their verdict on those improper questions. The first issue in the prosecutorial misconduct was the other crimes evidence. Again, that's just doesn't constitute reversible error. It was one sentence where the officer said, recognized him, wasn't brought up again, which distinguishes this case from all the other cases cited by the defendant. And unless your honors have any other questions. I don't believe we do. Thank you. Thank you. Counsel? I just want to make a few points. I disagree that it doesn't need to be explicit in the record. This is an element of the offense. What we have is, and I can tell you it is that page 627, page 341 and 339. Those are specifically Frost and Scott's comments. Frost talked about the defendant pointing a gun at him and then turning it to fire. Okay? At him is in the direction of turning it. It's not in the direction of. It's something different. What about the comment? I believe there was an indication in the briefs that there was evidence in the record that the shot came within a foot of the person. I don't. There was some comment about it being within a foot of his head. And my thought on that is if he's shooting in the direction of him from a foot away, how'd he miss him? It doesn't make any sense. If I'm shooting directly at you, which, of course, I never do, I didn't shoot. But I could shoot over here and be within a foot of your head, and I'm not shooting in the direction of you. I'm shooting in the direction of over there, not in the direction of you, of a foot over there. Those aren't the same thing. They're just not. And it's kind of the prosecutor's job to elicit the exact evidence that they need. Shouldn't he have said, didn't he fire in the direction of you? And then he would have gotten a yes or no answer. We wouldn't be here, would we? But he didn't do that. They left it up to this flimsy, he was pointing at me, and then he turned. That's pretty clear that he fired not in the direction. And when we talk about the other issues, when we talk about the, oh, we can go back to the other, whether this is harmless error, any of these things are harmless error because of all of the other testimony, I think the state's being a little generous when they say we have the defendant's version of the events and we have everyone else's version of the events. We've got, like, nine versions of the events. And the three unbiased people who saw from the other apartment, they can't agree with each other on this. One of them says, I heard him say he was going to kill me. Well, even Frost said that never happened. The other witness said nobody said anything. Another one said there was shouting. One said he was wearing a yellow coat. One said, I don't know if he was wearing a coat. One person thinks he's just some black guy. Nobody knows anything about this. They can't agree on the one most exciting thing they had ever seen, and they actually talk about that, that this is the biggest thing to happen in the projects in a long time. Of course they stood at the window and watched it. And yet they still can't agree on what they saw? I don't think we can call these necessarily, they may be unbiased. That doesn't make them credible. And it certainly doesn't line up that we have the defendant's version versus the world. We don't have that. We've got the defendant's version and a whole bunch of other mess going on. We still don't know what happened in this case. I bet you the people who saw it don't know what happened in this case. But it's the prosecutor's job to have proven it to the jury. And just because they reach a verdict doesn't mean it's untouchable. It's your job to determine whether or not they had any business reaching that verdict. In this case they just didn't. So I'd ask you to reduce that one charge and to order a trial on the others. Thank you. We appreciate the briefs of all counsel, the arguments. Take the case under advisement.